Good morning. Michael Magnuson. I'm representing Charlene Gravitt. I missed the earlier part of the calendar. My intention is to speak for about 12 minutes and then reserve 8 minutes in rebuttal. Is that inappropriate? Keep track of your own time, though. Okay. As the Court knows from reading the briefs, what we have here is the case of, without dispute, an innocent woman whose life has been turned upside down as a result of this, what I think everybody would consider an unfair and what we consider to be an unconstitutional investigation. The other parties to this, the Bureau of Narcotics Enforcement people have all moved on. Presumably, Detective Kosky from the Riverside Police Department has moved on. The real crooks, the real bad guys here have been arrested, tried, and they're in federal prison. At the same time, Mrs. Gravitt continues to be unemployed, continues to suffer the consequences of this very unfortunate turn of events in which she was singled out improperly and in which this investigation focused on her to the exclusion of the actual people who were involved in the crime. Could I ask you a question about the Fourth Amendment claims? Yes. Didn't she consent to the search? The consent issue, we believe there's a trial issue effect on that. Why? There doesn't seem to be any dispute that she consented. Well, the – Where's the dispute? Yeah, the dispute is that it arises in this way. The motion for summary judgment by the defendants never mentioned the issue of consent, so that was not briefed and there was no declaration addressing the issue. The state, the government has the burden of showing that the consent was given without coercion, knowingly, voluntarily. So it's a trial issue effect. So we think it's a trial issue effect. What is the trial issue effect on that? Well, the trial issue is whether the circumstances were coercive, were inherently coercive. And therefore, we believe that a jury or a trial fact has to weigh the evidence. There was no evidence submitted in the summary judgment on the issue of circumstances under which the consent was given. The bare fact of consent is in the record. But obviously, when that isn't raised by the moving party in their summary judgment, it doesn't make sense for the party responding to that to brief and highlight that issue. It's going to be an issue of trial if we get back in the trial court. There's no doubt about it. Well, if it's true, though, I mean, if consent, if uncoerced consent was given, would you agree that the Fourth Amendment claims disappear? I agree, Your Honor, that if the consent is a waiver of the Fourth Amendment probable cause requirement with respect to the search warrant. Is the scope of consent at issue in this case? The scope of consent would be at issue. To the extent there was consent, it was strictly to the home. There was no consent given to searching the other, the storage garage, the safe deposit box. So there's an issue of scope. And, of course, that doesn't get to the reasonableness of the search. We're talking about consent to the search. And, of course, our contention is that the search was conducted in an unreasonable manner. we had from his Gravitz declaration, 40 uniformed V&E and Riverside Police Department officers descending on the small home occupied by somebody that they knew well. It was not a security risk. It wasn't occupied. They knew it wasn't occupied. At some point, overkill becomes unreasonableness. Did they do it? Was there any damage done to them? There was no damage done. Is there any claim that they mishandled them, Ms. Gravitz? No. It's just the presence of all these officers and their vehicles and their fancy gear and their badges. Yeah. It's intimidating. And we believe it was intended to be intimidating. There couldn't be any. So why is that constitutionally unreasonable? Well, we believe that that amounts to a constitutionally unreasonable search because that type of overkill was way out of line with what the circumstances required. If they had come in with five guys and conducted a typical kind of search, I don't think we would have the argument. But the actual intimidating factor for this is the primary thing that has caused Ms. Gravitz her damages. And at some point, you've got to say, we believe, that there's a constitutional violation when you have that overkill component. If they had 100 officers and 50 cars descend on this, would that be where the line is drawn? Fundamentally, we believe that has to be an issue for the jury to decide. Okay. Go ahead. I was going to say, if consent's not an issue here on the Fourth Amendment claim, then what's the dispute about? Put it aside. And put aside, again, reasonableness. The claim was they submitted a false affidavit to get the search warrant. Yeah. I really think that the heart of this is the false affidavit. The way this investigation was conducted is a textbook example, really, of some of the problems of law enforcement. What they did is focus. They knew that this break-in was probably conducted by an inside job. One of 14 people had access to this vault. Ms. Gravitz was the only non-sworn employee that had access. Everybody else was a sworn law enforcement officer. They basically concluded it couldn't have been any of them, and therefore it had to be her. And so then they zeroed in on that, and they, what we might call these days, spun the facts to cause the focus on Ms. Gravitz. But not only spinning. Some of the things were actually inaccurate information included in that affidavit. And the combination of that really pointed neon signs at Ms. Gravitz. There was no place else to go with this. If you have the false statement that her husband was working in the vault the week before the break-in, if you have the alleged fact, which was wrong, the statement in the affidavit that she was the only person that had, quote, an intimate knowledge of the vault and the locker, statement that was wrong because the other 13 people did as well, the statement that she was the only one that had the key to the locker, when the other 13 people, the key was kept at her desk, but everybody knew where it was. These statements, totally wrong, in which a reasonable officer should have known, I'm sure the B&E people that worked with her had to know that these facts were wrong. Yet they found their way into that affidavit. And we've argued in our briefs that if you pull those incorrect assertions out, you simply don't have enough to amount to a probable cause. That affidavit shows how this investigation was conducted and really establishes them on the wrong track and their desire to bring the focus so totally on Mrs. Gravitt led them to make recklessly incorrect statements in that. And that is what amounts to the Fourth Amendment violation. Why don't you move on to your due process claims so we make sure that you cover everything in your allotted time. Right. The due process claims that she lost her job as a result of this conduct and that this amounted to a constructive discharge. Again, our feeling is that this is a triable issue of fact. You have to put those circumstances in front of the trier of fact, the circumstances being this investigation, all her friends are told that she's the prime suspect. She's put on involuntary leave. She's told for months that she is essentially the person that committed these offenses. And then to expect, and they were exonerating her, and then to expect her to come back to work is really unrealistic. Let me ask a few questions about this. I'm not quite sure I understand whether it's a due process property interest claim or a due process liberty interest claim. Okay. You have to argue both. I'm curious, though, on the property interest claim, there's no dispute here that she was a civil service employee and she couldn't be let go without good cause. And under California law, under Kelly v. State Personnel Board, she was entitled, if she had been fired outright or suspended without pay or moved to another location at a lower job status or something, they would have had to afford her a hearing and all the procedural rights. They put her on administrative leave with pay. They apparently didn't remove her from her position. She retained the same titles. They removed her. She never – I don't quite understand how that – how that administrative scheme kicks in in a constructive – with a constructive termination claim here when the State really – Would you contend that putting her on administrative leave is sufficient to trigger hearing rights? No. What we're really saying is they were required to bring her back under circumstances in which she was exonerated of these crimes. Isn't that a common law tort claim rather than a constitutional claim, though? We believe it amounts to a constitutional deprivation of property and liberty interest. Yes, it's also a common law tort claim. Right. I mean, I understand the common law tort theory, but where I have some difficulty is that the constitutional theory is you're entitled to a hearing. But in the case of a constructive discharge, a hearing is almost impossible. I mean, it's a – in a sense, you're saying that the employee quit, but the employer should have known about it and given a hearing before creating the conditions. I mean, I just don't have a case that says that. Do you? We have not found a case on point. This is an unusual circumstance in which for due process claims to arise. I acknowledge that. Did she ever demand any kind of hearing? She did not. No. Her only – her thing was I can't go back there. Yes, I understand completely the constructive discharge portion of that, and the district court may have gotten that one wrong. But I'm not sure that gets you to a tribal issue fact on a due process claim, because I just don't understand quite analytically how a constructive discharge can be – can trigger a right to a hearing. Well, the – I mean, that's the essence of the claim. Yes, yes. The right to the hearing is the logical way to resolve the contradiction that's created by the government accusing her of this and putting her out and then saying, okay, it's – you can come back to work, but you're still under a cloud of suspicion for this. And given what has all gone before, this would be a way to essentially purge the taint of the – what we believe to be the improper investigation. But if they insisted – if the employer insisted on a hearing having not resolved in its investigation, wouldn't that create some additional problems with her if she chose to assert the Fifth Amendment? I mean, that's – I mean, it seems to me that if the employer is in a no-win situation as far as a hearing is concerned, you're saying that they have to give a hearing. But if they do give a hearing, they probably are engaging in some improper investigatory tactics. Well, our feeling is really that they should have concluded at a much earlier stage of this proceeding that she was not involved and have acknowledged that they were on the wrong track and, you know, we apologize, come back to work. You know, that approach is the one that we think would be consistent with due process. You have about four minutes left. I know. I just have one factual question for you. In the record, there's a reference that she didn't return because of disability or something. She's on disability leave. Is that – am I misunderstanding the record in that respect? No. She also had a disability claim, which was settled independently of this. And so – But she's able to return to work. There's nothing physically – There's nothing physically wrong. You know, after a certain period of time, there was nothing – well, no, nothing physically wrong with her ability to return to work, right. Okay. Why don't you reserve your remarks. Yeah, I'm going to hang on to the last three minutes and 38 seconds. Good morning. My name is Karen Darling. I represent the State of California, specifically the Bureau of Narcotics Enforcement, as well as individual appellees, Mendes, Sid, Brown, Wallace, Zegler, Hatano, and Talich. And what I would like to start with right away is the due process arguments and the defamation, because that is specific to my appellees. And then if I have any additional time, I'd be more than happy to deal, especially with the consent issue, because I know that Mr. Ramirez will be available to answer many more questions with regard to the affidavit, since that's an issue that's relevant to both. So if I may, first of all, with regard to the due process argument, I would like to start out by saying that in this particular case, the State, specifically the Bureau of Narcotics Enforcement, cannot be liable under the due process violation because of the Eleventh Amendment. An appellant in her opening brief has conceded that, okay. So then going forward, with regard to the due process violations, there's been no individual defendant who's been an appellee or anyone who's been served who would have been liable for the supposed deprivation of due process rights. The only person remotely related to this particular issue would have been an appellee, Chief Brown, and the only conduct he had in connection with this issue was the fact that he gave the appellant the administrative leave papers. There's no evidence to support a claim that he was involved in the decision to put her on administrative leave. Now, but I think the argument would be that he created the atmosphere which engendered the construct or caused the constructive discharge, right? Going forward. So why is it, I mean, assuming that that's an issue, wouldn't he be the logical person to sue? Who else would the – who else do you think they should have sued that they didn't sue? The person who would have made the – well, first of all, Your Honors, the appellant was never terminated. So therefore, there's no –  So let's get back. You're talking about the individuals here in the 11th Amendment immunity and so forth. So Brown, we know Brown's role. Who else should have been sued under your theory but wasn't sued? Whoever made the decision to – Who was that? To terminate her. But there is no one because she was not terminated. Okay. But I know her claim is constructive termination. So I think Brown certainly is involved, allegedly, in the creation of the atmosphere. I thought you were saying that he didn't make the decision to put her on leave. Who did that? I don't know. Okay. Someone up in Sacramento. But in an attempt to try and answer your question with regard to the constructive discharge, the way that constructive discharge works is that the individual – the conditions at work must be so intolerable or aggravated that a reasonable person would feel compelled to resign. In this particular case, the appellant was not at work. So she was not constructively discharged from work. Rather, she was placed on administrative leave. So any claims about how intolerable things would have been is purely speculative and there's no support for that because she was not constructively discharged. Her claim is not non-frivolous, is it? I'm sorry? Her claim is not non-frivolous. I mean, she claims that she was accused of having committed this crime, a very serious crime. But the fact that she was not terminated from her employment and the fact that she did have opportunities to request a hearing and the fact that there's no evidence that the work conditions would have been tolerable means it does not give rise to a due process violation. Well, there's several issues there. But on the issue purely of constructive discharge, when Chief Brown calls everybody together and tells her that she's a prime suspect in one of the largest thefts in the It seems to me that there's no legal requirement that she has to return to work and determine that, in fact, that people don't want her there. I mean, to me, I'm not sure that that's a legal defense that would eliminate any issue of fact. So explain to me why you disagree with that. Well, actually, the evidence does not support that she was not wanted at work. As a matter of fact, when she was put on administrative leave, there was a catastrophic time bank that was created and that set forth in the brief. And I think she was given 633 hours, 533 of which were given by the Bureau of Narcotics Enforcement in Riverside. There's been a couple declarations prepared by appellant indicating the support of some of her coworkers. So there's evidence that she would have been supported. Sure. You've got evidence. She has evidence. Why isn't that a tribal issue on the question of constructive discharge? Again, it would be our position that she was never constructively discharged. She was never terminated. She was given. We know she wasn't terminated because nobody is in a constructive discharge case. And she was also given, though, an opportunity to come back to work, to work at a different location. She chose to retire. You just used the word retire. What do you mean by that? I understood it to be something disability. My understanding, I apologize, I cannot point the court to where it is in the record. But I recall reading somewhere that she actually retired. I can find that while I'm... That's okay. What else do you want to talk to us about? With regard to defamation, I would like to make a few points, especially with regard to some of the things that were raised in the reply brief of appellant. First of all, the statements that have been attributed to Apelli Brown are true statements. And, therefore, that would not rise to the level of defamation. I've briefed what those statements are, and none of them are untrue. Specifically, the court, when they granted the motion for summary judgment, did specifically say something to the effect that the fact that she was a suspect in a crime does not necessarily mean that she actually committed the crime. And a review of slander means that the person has to be actually accused of a crime. And I've looked through all the cases in the authority that were cited by appellant, and he makes a reference to Witkin. However, the reference to Witkin in his reply brief refers to the definition in cases relevant to a liable cause of action, which is when there's publication. And in this particular case, there was no actual publication. It was an oral statement. Many of the other cases cited by appellant in the briefs refer to, again, liable cases or a slander per se, which was unique to a radio broadcast. One of the cases cited by Gills, I'm sorry, by appellant was Gills v. Hughes, and that cited another case, Milkovich. And in that particular case, the fact that a statement was made that the individual was an incompetent surgeon was found to be an opinion because it did not state actual facts, rather that it could be proven true or false. And what Gills v. Hughes continued to talk about was the fact that the individual, the surgeon in that case, went and asked for a hearing to try and clear his name, and it was resolved against him. And we would argue that that's similar to the fact that in this particular case, a search warrant was issued. That supports the statement made by Appellee Brown that she was a suspect because the fact that the magistrate signed the warrant implies that the evidence supports the belief that appellant committed the crime. Well, what do you make of the fact that, if I have my time sequence correct, that he made the statement after the search had been unsuccessful? It would certainly be more advantageous for my argument if they would have found something, but that, to me, would be a hindsight argument. They still they had evidence to put in the warrant, I'm sorry, in the affidavit requesting the warrant. They were going to continue with their investigation. It had not been completed. So perhaps they were going to look for other avenues and other means of trying to obtain evidence. Well, it seems to me that perhaps the issue, because she isn't a public figure, so she doesn't have the high burden of proof on that. But it seems to me the evidence might or theory might well be that the objective state of facts was such that no reasonable person could say to a group of coworkers that she was a prime suspect, because at that point that search had turned out nothing. And they had no other evidence except that she was one of the 14 people, right? That's true. However, I would also again defer to the district court wherein they indicated that just the fact that the statement was made that she was a suspect does not mean that he's accusing her of the crime. And the individuals who heard it, their opinions were not relevant to a determination of whether it was defamatory or not. There has to be an actual false statement that she committed the crime. I would also like to point out. That may be true for a per se violation, but it may not be true for a slander. If everything objectively indicates that she couldn't be a suspect at that point, and I know that you think otherwise, but we're talking about a tribal issue of fact at this stage. If the objective evidence indicated that there was no possibility that she could be a suspect and it's announced that she is a suspect, just say to the media or something like that. I think that's a tribal issue of fact on defamation. I think Richard Jewell is a good example who prosecuted a fairly successful defamation claim under similar circumstances. Since the investigation was continuing and it was not over, the fact that nothing had been obtained pursuant to the warrant was not necessarily proof that she hadn't committed the crime. And again, it's like Monday morning quarterbacking. It's after we've looked at one source to see if there's anything and there isn't, but there was enough in the search warrant to justify the search warrant. So therefore, the statement made by Apelli Brown wasn't necessarily false. I'm sorry. It wasn't necessarily false. Perhaps it wasn't true, but it was not necessarily false. Okay. Why don't you move on to the next one? I see I have nine minutes left, which I was going to give to Mr. Ramirez. All right.  Mr. Ramirez. Please report. My name is Eugene Ramirez, and I represent Apelli, Detective Gary Kosky. Detective Kosky is here on a very narrow issue, and that deals with the issue of the consent and the intent of the defamation case.   I'm going to give you a brief overview of the case.  was presented with a warrant for his role as the affiant in obtaining of the search warrant. And at this stage, I'm just shocked that the appellant continues to pursue that there was no consent. I'd like to point out to the Court the various issues. You said there was a raised balloon. And I'd like to point out to the Court exactly in the record where it was raised several times. We argued the issue of consent both in the motion for summary judgment itself and from the trial court. I would point to the separate statement of facts submitted by Detective Gary Kosky, number 16, and refer the Court to page 52 and 61 of the appellant's excerpt of the record. I would also refer the Court to an excerpt of the deposition of Detective Kosky, a deposition taken by appellant's attorney that dealt with the consent issue, and we included that in our motion for summary judgment. That is found at page 93. All right. So we'll assume that you raised the issue. Yes. I would also refer to the appellant's excerpt, page 150, which is a copy of the declaration submitted by the appellant herself in paragraph 6, in which she said, I was asked for it. I gave verbal consent. I also signed a written document dealing with the verbal consent. Yeah, I don't think they contest that consent was given. What their argument now is that it was coerced. Well, counsel cited the Shibu case, and in reading the Shibu case, I feel, well, that's an opposite to what's going on in our case because the Shibu, that dealt with the officers going to a house without a warrant, knocking on the door. The resident or the suspect they were looking for opens the door. The cops said, well, do you mind if we come in? The suspect doesn't say anything, and the officers walk in, conduct their search, and eventually arrest them for whatever it is they found. That's not the same situation we have here. Rather, we have a situation where this investigation, the theft occurred on the July 4th weekend of 1997. I believe the search of the house of Ms. Gravitt actually occurred on November 10th or thereabouts of 1997. So several months had transpired. Detective Konski and another detective, Detective Barnes, of the Riverside Police Department are talking to Ms. Konski, and they say, listen, we would like permission to search your house. Yes, you have that permission, and they ask her to sign a consent form. She signed that consent form. Then the Detective Konski says, listen, we also have a search warrant authorizing us to search that house, some storage lockers, and some other places as well, including, I think, a bank safety deposit box. They go to the house, and Detective Konski is not being accused. In fact, I think the appellant has conceded that they are not arguing that Detective Konski did anything unreasonable during the search of the house. In fact, he sat at the kitchen table with the appellant, bought her lunch, and sat talking to her while other members of the B&E conducted the search of the house. Now, I've heard some arguments here that the statements provided by Detective Konski in the affidavit were false. Well, I think it has to go beyond more than just false. As the trial court recognized, and in her, I believe, lengthy opinion, almost 20 pages, said, there has to be a substantial showing of a reckless disregard for the truth. That's the first. It's a two-part process here. First, you have to show that substantial disregard for the truth. Then once, if you can show that, then we go to the second prong, and that is, well, let's excise those offending statements, and let's see if we still have sufficient information for which the probable cause would issue the search warrant. And if you look at Detective Konski's affidavit, it's 10 pages long. I mean, we're talking more than just four of them. I've read a lot of long briefs. It doesn't make them any more powerful than... No, but if you look at the detail, again, this is more than just repeating over and over again why he believes Ms. Gravitt is the suspect behind those four statements. But it details a lengthy investigation, and it's not all based on what Detective Konski did. In fact, he notes throughout his affidavit that much of what he is basing his opinions on is based not only on what he saw, what he investigated, but also what he was told by other B&E agents. I think Special Agent Mendez was involved in counter-surveillance, and it was his opinion that the driving habits of the Gravitts were suspicious and indicated counter-surveillance driving techniques based on their experience. Investigator Chin, who conducted the financial audits of the Gravitts, came forward with an opinion that based upon the tax liens and the amount of money that they owed, that they were in financial trouble. And actually, they did financial audits on 14 of the suspects, originally focused on 50 people that they believe may have been involved in the theft of almost 300 kilos of cocaine. They then reduced that further from 50 down to 14. Of those 14, they determined 11 of those had access to the vault, such that they not only had access to the key, but they also had access to the various codes to get inside of the vault. Many people could get to the outside part of the vault. Very few people can get further inside the vault. I think suspicion immediately centered on the appellant because of the nature of her job. She was the evidence custodian. She had the key. She had knowledge of what was stored inside that vault. In fact, I believe the evidence was also contained within the state's brief that the appellant was supposed to have destroyed several kilos of cocaine and had documented that she had, in fact, destroyed that cocaine. Only later did everyone find out that that cocaine was not, in fact, destroyed, which, again, gave credence to the fact that she might be involved. Also, during the questioning of this granted by Detective Konski, her responses to his questions would seem to suggest that, well, maybe she has more knowledge than someone else who had been questioned, who had no knowledge, would be providing. Things such as, well, I can see where a person who might be involved in this might be scared if they were to have had a gun placed against their head or threatened in some way. Based upon Detective Konski's experience, those seem to be somewhat unusual type of statements to be made and felt that that lent credence again to the fact that she was a suspect. Again, I think it needs to be important here that the affidavit of probable cause was not suggesting that she's absolutely guilty, but rather it was requesting permission to serve a search warrant to see if there was additional evidence such that she could be determined to be a suspect or not. I disagree with counsel's assertion that it's undisputed that she's absolutely innocent. Up until a very short while ago, the U.S. Attorney's Office was still considering whether she should be prosecuted. And is that – where is that exactly in the record? It is – I do not believe it's contained anywhere within the record. You probably ought not to mention it. I believe that, as the trial judge indicated in her lengthy opinion, the appellant was unable to show a reckless disregard for the truth. It just isn't there. They were unable to show that Detective Kosky should have known that whatever he was told by the special agents of the B&E were false anyway. There was just no indication. Now, counsel also cites to Mendocino an environmental case as a suggestion that what Detective Kosky heard from the B&E agents should somehow substantiate that this is material falsehoods. But when you look at the Mendocino case, there was a conflict between the FBI agents and the Oakland police officers when they were investigating the bombing of the car. Here we have no conflicts in the testimony between the B&E agents and Detective Kosky. There's no contradictions in their testimony. There are no material falsehoods here. But let's assume there are for sake of argument. Then we have to go to the next prong, and that is let's excise these offending statements and let's determine whether there's still sufficient probable cause. The court did that and looked at all the other vast amount of evidence, again, just lending credence to whether there's probable cause to issue the warrant. And when you look at all that substantial amount of evidence, there certainly was probable cause to issue the warrant in this matter. For that reason, I believe that I have one last question for you about what happened in the district court below. Was there an argument by Gravitt that the consent was involuntary? No. And, in fact, if you read her declaration, never once says they were pointing their guns at me. Or coercive. There was no indication it was coercive. And even when you look at the Characterize it for me, if you will, for just one moment, the circumstances under which she signed the consent form. I believe they were at the police department. I want to say it was after she had undergone a polygraph exam and it came back inconclusive. Detective Barnes, Detective Kosky were in an interview room with Gravitt, and they said, listen, we would like permission to search her house. They had not yet told her that they had the search warrant. She says, yes. They said, well, we would like for you to sign this consent form. She says, yes. They signed the consent form. They then said, well, we did have a search warrant for your house. You proceeded to the house, and that's where the search took place. All right. And with that answer, your time has expired. Thank you very much for your argument. We'll hear rebuttal. A little over three minutes. Yeah, it was 337. Yeah, to respond to a couple of the points made by colleagues, first on this issue of the probable cause, the Fourth Amendment, and the probable cause for the issuance of the warrant, as we have pointed out, the summary judgment is improper where conflicting inferences can be drawn from the facts. So the question, we believe, the question of whether this was reckless disregard for the truth is a jury question under these circumstances. You can take the facts as they exist, but the inference to be drawn from them of whether this was willful or reckless is something that a triarch fact should decide. It's very interesting, and I don't know how often this happens, where Detective Coskey signs the search warrant, and he didn't prepare it. I was shocked when I discovered that, taking his deposition, and he testified that it was prepared by B&E agents, or Special Agent Mendez primarily, and input from other people. So the obligation, and we've cited cases on this point, it was pretty obvious, that you have to conduct some reasonable inquiry to make sure the facts that you are relying on are accurate. And there was no indication in the record at this stage of the proceeding that any investigation was conducted by Detective Coskey before he signed that affidavit. To turn briefly to the issue of consent and the circumstances under which that was given, as I've noted previously, we don't think there's a full record on this, and there wasn't developed a full record sufficient for the appellees to meet their burden of showing that this was not coerced, that it was knowing and intelligently given. But do they have to show that in a civil rights action like this, do they have to show that it was not coerced? Yes, my understanding of the cases that we've noted in our papers stand for that proposition. So I believe, and it just wasn't raised in the moving papers on the summary judgment, so that wasn't addressed. What is in the record is that she was told, go down to the Riverside Police Department that morning, and she spent the day there and was subjected, as she says in her declaration, which is essentially the main principle evidence on this issue, she was subjected to intense inquiry, polygraph, repeated questioning, accusations that she had committed the crime, and then at about 3 o'clock in the afternoon was asked whether they could go search her house, and she said okay, and she apparently signed something which is not in the record. The written documentation was not part of the record in the district court, and that's where we stand with that. So our feeling is, yeah, this is going to be an issue, a trial, but it's not a basis upon which summary judgment can be granted. And with that, your time has expired. And with that, my time is up. Thank you both for your arguments, and just because you didn't have time to make all of them today, we have read your briefs thoroughly and will continue to do so. If you haven't weighed any issues.
judges: Hall, Thomas, Paez